**NOTICE:   SLIP OPINION**
**(not the court's final written decision)**

The opinion that begins on the next page is a slip opinion.  Slip opinions are the written opinions that are originally filed by the court.

A slip opinion is not necessarily the court's final written decision.  Slip opinions can be changed by subsequent court orders.  For example, a court may issue an order making substantive changes to a slip opinion or publishing for precedential purposes a previously "unpublished" opinion.  Additionally, nonsubstantive edits (for style, grammar, citation, format, punctuation, etc.) are made before the opinions that have precedential value are published in the official reports of court decisions: the Washington Reports 2d and the Washington Appellate Reports.  An opinion in the official reports replaces the slip opinion as the official opinion of the court.

**The slip opinion that begins on the next page is for a published opinion, and it has since been revised for publication in the printed official reports.**  The official text of the court's opinion is found in the advance sheets and the bound volumes of the official reports.  Also, an electronic version (intended to mirror the language found in the official reports) of the revised opinion can be found, free of charge, at this website: https://www.lexisnexis.com/clients/wareports.

For more information about precedential (published) opinions, nonprecedential (unpublished) opinions, slip opinions, and the official reports, see https://www.courts.wa.gov/opinions and the information that is linked there.

Filed
Washington State
Court of Appeals
Division Two

April 11, 2023

# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| STATE OF WASHINGTON, | No. 56856-0-II |
| Respondent, | |
| v. | |
| TROY C. RESTVEDT, | PUBLISHED OPINION |
| Appellant. | |

LEE, P.J. — Troy C. Restvedt appeals his convictions for second degree theft and six counts of unlawful factoring of a credit card or payment card transaction. Restvedt argues there is insufficient evidence to support his convictions for unlawful factoring of a credit card or payment card transaction because RCW 9A.56.290, the statute under which he was charged, does not apply to his conduct. Restvedt further asserts that if there is sufficient evidence to support his unlawful factoring convictions, then those convictions violate double jeopardy. Restvedt also argues that the trial court abused its discretion when it prevented him from impeaching a witness, which violated his right to present a defense; the prosecutor committed misconduct by shifting the burden of proof; and the cumulative error doctrine requires reversal of all his convictions.

We hold that there is insufficient evidence to support Restvedt's convictions for unlawful factoring of a credit card or payment card transaction under RCW 9A.56.290. We also hold that the trial court did not commit evidentiary error or violate Restvedt's right to present a defense when it precluded him from impeaching a witness because Restvedt could not articulate how his impeachment inquiry was relevant. Additionally, the prosecutor did not shift the burden of proof,

No. 56856-0-II

and therefore, there is no prosecutorial misconduct. Finally, because there were no errors, the cumulative error doctrine does not apply. Accordingly, we reverse Restvedt's convictions on six counts of unlawful factoring of a credit card or payment card transaction, affirm the second degree theft conviction, and remand for the trial court to dismiss with prejudice the six counts of unlawful factoring of a credit card or payment card transaction and for resentencing.[1]

## FACTS

### A. BACKGROUND

Restvedt and Jessica Stirling met and began dating in 2016; they began living together shortly after. In late 2016, Restvedt and Stirling moved to Onalaska. In Onalaska, Restvedt worked under-the-table contracting jobs while Stirling made income from an Etsy[2] shop. Otherwise, the couple primarily lived on Stirling's savings. Restvedt and Stirling later moved to Centralia, into a home Stirling bought.

Throughout Restvedt and Stirling's relationship, Stirling owned a bank account at OnPoint Credit Union. She had a debit card associated with the account. Restvedt did not have access to Stirling's bank account nor did he possess his own bank account. Restvedt did, however, have his own credit card.

---

[1] Because we reverse Restvedt's multiple unlawful factoring of a credit card or payment card transaction convictions and remand for dismissal of those charges with prejudice, we do not address Restvedt's double jeopardy argument relating to the multiple convictions for unlawful factoring of a credit card or payment card transaction.

[2] Etsy is an online marketplace for small business owners and artists to sell their products to consumers. ETSY, www.etsy.com/about (last visited Mar. 31, 2023).

2

No. 56856-0-II

When Stirling needed to access funds from her OnPoint account, Restvedt and Stirling would drive to an automated teller machine (ATM) together. Stirling would give Restvedt her debit card because he was in the driver's seat and then give him the personal identification number (PIN) to remove the cash. Generally, Stirling used her debit card only at ATMs or store cash registers. According to Stirling, she never gave her debit card to Restvedt nor did she give Restvedt permission to use it any time he wanted.

Early in Restvedt and Stirling's relationship, Stirling would find her OnPoint debit card missing. Stirling would then see charges to her account that she had not made. Each time this happened, Stirling would replace her debit card and choose a new PIN. Stirling suspected Restvedt of using her card without permission. She replaced her card several times over the course of her relationship with Restvedt. Stirling would move funds between her OnPoint account and other accounts she owned in an effort to "hide money" from Restvedt. 1 Verbatim Rep. of Proc. (VRP) (Mar. 24, 2022) at 169. Additionally, Stirling would keep her debit card hidden in different places around their home, including in her safe, her dresser, and in her wallet. Though Stirling never saw Restvedt take her card, Stirling believed Restvedt was the only person who would have been able to access her card.

In April 2020, Stirling noticed her debit card missing. She then checked her bank account online and noticed withdrawals. Stirling asked Restvedt where her debit card was. According to Stirling, Restvedt "looked at [her], and he patted all of his pockets, and then he patted his breast pocket and he pulled [her] card out of it and handed it back to [her]." 1 VRP (Mar. 24, 2022) at 135. When Stirling asked Restvedt why he had withdrawn money from her account, he replied, "'[T]hat was your asshole tax.'" 1 VRP (Mar. 24, 2022) at 135.

3

No. 56856-0-II

Stirling asked Restvedt to leave and they separated. According to Restvedt, his relationship with Stirling ended because he found out Stirling "was married." 1 VRP (Mar. 25, 2022) at 270. Stirling had been previously married from 1995 to 2004. However, she was not married at any point she and Restvedt were in a relationship.

A few weeks after Restvedt left, Stirling found video footage on a camera she owned of Restvedt allegedly making a withdrawal at an ATM at State Security Bank in Morton. The camera was a "GoPro knockoff" that Stirling primarily kept in her car on the dashboard. 1 VRP (Mar. 24, 2022) at 96. The video depicted Restvedt driving Stirling's truck to the ATM. After apparently exiting the vehicle and then returning to it, Restvedt turned the camera around and spoke into it. Restvedt then replaced the camera in its original position. The camera did not have any audio.

After seeing the video, Stirling accessed several months' worth of bank account statements. She noticed over 60 unauthorized transactions between January 7, 2020 and April 6, 2020. One of the transactions Stirling noticed was a $400[3] ATM cash withdrawal from Security State Bank. Other alleged unauthorized transactions included purchases at the "Buck Stop," "the Chevron in Centralia," and the hardware store. 1 VRP (Mar. 24, 2022) at 113, 115. According to Stirling, these locations were places that Restvedt frequented.

Stirling contacted law enforcement in early May to report Restvedt for theft. Sergeant Jeff Humphrey responded to Stirling's theft complaint. Stirling provided Sergeant Humphrey her bank account statements with X's placed next to unauthorized charges that Restvedt allegedly made. Stirling also provided the video of Restvedt to Sergeant Humphrey, along with a receipt from one

---

[3] The total withdrawal amount is listed as $403. However, $3 of the $403 appear to be an ATM withdrawal fee.

No. 56856-0-II

of the alleged unauthorized ATM withdrawals. The receipt was from the Morton Country Market. Stirling did not share with Sergeant Humphrey the fact that she had replaced her debit card and PIN several times over the course of her relationship with Restvedt.

Sergeant Humphrey contacted the Morton Country Market and requested surveillance footage of its ATM. The Morton Country Market surveillance video showed Restvedt allegedly using Stirling's debit card at the ATM—apparently checking the account balance—and then making purchases at the cash register.

The following day, Sergeant Humphrey contacted Restvedt. When Sergeant Humphrey explained the purpose of his call, Restvedt appeared "familiar with what [Sergeant Humphrey] was talking about." 1 VRP (Mar. 24, 2022) at 236. Restvedt initially denied making any unauthorized transactions with Stirling's debit card. However, when Sergeant Humphrey asked Restvedt about the video from Stirling's camera, Restvedt admitted to withdrawing $400 and making the video; he told Sergeant Humphrey that "this was a tax for [Stirling] being a bitch for the last four years." 1 VRP (Mar. 24, 2022) at 237. Restvedt then told Sergeant Humphrey that he did make withdrawals and purchases using Stirling's debit card, but that he had provided Stirling cash to deposit and his withdrawals were a means of accessing that cash. When Sergeant Humphrey asked Restvedt whether the cash Restvedt gave Stirling to deposit would be reflected on her bank statements, Restvedt "changed his story again and said she may have put the cash in her safe at her residence." Clerk's Papers (CP) at 12.

In June, the State charged Restvedt with theft in the second degree (Count I) and nine counts of unlawful factoring of credit card or payment card transaction (Counts II-X). Restvedt

No. 56856-0-II

allegedly made $1,859.60 worth of unauthorized purchases or withdrawals. Restvedt pleaded not guilty to all charges and elected to be tried by a jury.

B.      JURY TRIAL

The superior court held a two-day jury trial in March 2022.[4]

1.      Restvedt's Testimony

Restvedt testified that he used Stirling's debit card, but always with her permission and knowledge. Restvedt acknowledged that he visited and made purchases at the locations reflected on Stirling's bank statements. Restvedt further testified that if he ever did have Stirling's debit card, he "would give it right back to her." 1 VRP (Mar. 25, 2022) at 275. As to his admission to Sergeant Humphrey and Stirling that he withdrew $400 from Stirling's bank account, Restvedt stated, "[Y]eah, I told both of them that I withdrew the money. . . . I mean [Sergeant Humphrey's] line of questioning, if I can remember, I—I was a little flustered. . . . [Y]ou know, the breakup was still fresh, so it was still pretty painful." 1 VRP (Mar. 25, 2022) at 282.

2.      Evidence of Stirling's Name

Stirling also testified during trial. During Stirling's cross-examination, Restvedt's counsel attempted to inquire about Stirling's last name. The State objected based on relevance. The trial court excused the jury and Restvedt's counsel argued:

> [DEFENSE COUNSEL]: So Ms. Stirling has used a number of names over the years. And contrary to what she has testified to, one of the—probably main reason that the relationship broke up was because she was continually dishonest with [Restvedt]. [Restvedt] did some investigation and confronted her on that, and that's ultimately what caused the relationship to end.
> But he had confronted her about some of her past that he had discovered. She, of course, denied it, and there was an argument, and he ended up leaving the

---

[4] The trial date was reset several times. The trial was originally set for November 2020.

6

No. 56856-0-II

relationship. And that's where it's going, based on her deception during the relationship, which includes her names and who she was or is currently married to.

. . . .

. . . [I will ask] when she started using the name Stirling, why, and if she has gone by any other names. And I'm going to be asking her if she's currently married.

. . . .

[THE COURT]: How is changing a person's name—how does that relate to dishonesty?

[DEFENSE COUNSEL]: . . . [T]he central focus of this case, Your Honor, is credibility.

. . . .

. . . [B]ecause this case comes down to her word against [Restvedt]'s word, and that's what it's going to be. And what I'm trying to show is her veracity or lack thereof.

[THE COURT]: By changing one's name? I'm not seeing the connection between changing one's name and—or having different names and being a dishonest person or how that affects your credibility. I'm not seeing the connection, if you can explain that to me.

[DEFENSE COUNSEL]: And if she answers truthfully to what [Restvedt] may testify to, no harm, no foul. But I don't anticipate that she's going to give me the answers that I anticipate are truthful and [Restvedt] is going to testify, and it comes down to the jurors being able to weigh credibility between [Stirling] and [Restvedt].

. . . .

. . . [Q]uite honestly, Your Honor, I'm just trying to make her look like a liar.

[THE COURT]: I understand. And that's a valid strategy, of course, for any witness, to try to point out dishonesty. I'm just not seeing—I'm just trying to follow, linearly, how you get there by asking her—let's play out the scenario.

7

No. 56856-0-II

> . . . .

> . . . She says she hasn't used different names. And what proof do you have that she has?

> [DEFENSE COUNSEL]: . . . I don't have documents in my possession today to approach her and say, hey, isn't this a marriage license where you were married to so and so and you took his name?

> . . . .

> . . . I can tell you what I've learned from [Restvedt].

> . . . .

> [THE COURT]: . . . I'm just not seeing that asking that question without an offer of proof that she has or hasn't used different names—and if she says she hasn't, not having anything—anything to prove otherwise, I just don't see that that's something you can go into.

1 VRP (Mar. 24, 2022) at 138-143.

Later during the trial, Stirling testified that she had been previously married from 1995 to 2004. She stated she was not currently married. Stirling also testified that she chose her current last name around 20 years ago and had it formally changed through the court. Stirling had chosen her name because "[i]t ha[d] family heritage." 1 VRP (Mar. 25, 2022) at 291.

3. Closing Arguments

During closing arguments, the State argued:

> [STATE:] [T]here's this nonsense about [Stirling] being married. He's the one that broke up because he found out she had been married. Really?
> Two things. One, it can't be true, because it would have been easy to find out; right? I mean, he could have gotten a marriage certificate somewhere and—

> [DEFENSE COUNSEL]: Objection, Your Honor. Burden shifting.

> [THE COURT]: Sustained.

8

No. 56856-0-II

> [STATE]: Picture that argument they had. All right? Ms. Stirling says that the argument was over him taking money from her without her permission. He says the argument was over the fact that, wow, she had been married and he didn't know about it.
>
> Which one of those is more reasonable? Which one of those, balanced against your experience, is the more reasonable one? Which one would be easier for the other party . . . at the time, to look into regarding their version of the argument?
>
> She said she changed her name at one point. A lot of people who get divorced change their name afterwards. That's not uncommon at all.

1 VRP (Mar. 25, 2022) at 320-21.

> 4.      Jury Instructions

The State proposed jury instructions. Restvedt did not propose any instructions and did

not object to the State's proposed instructions. The trial court stated:

> And I think that the Court will set a rule that says both sides shall present jury instructions and if you don't, then I think that can be construed as a waiver of or joining in what was proposed.
>
> . . . .
>
> . . . It basically prevents you from being able to say, well, I object to those . . . or they were improper on appeal. . . . [Y]ou know, you can't decide on them and then later challenge those instructions as being improper.
>
> [DEFENSE COUNSEL]: . . . I am absolutely not making any objections or exceptions, objections to those given or exceptions to any not given.

1 VRP (Mar. 25, 2022) at 285.

There were 24 jury instructions total. Jury Instruction No. 6 stated in pertinent part:

> To convict the defendant of the crime of unlawful factoring of a credit card or payment card transaction as charged in Count II, each of the following elements of the crime must be proved beyond a reasonable doubt:
> (1) That on or about or between the 7th day of January, 2020 through the 14th day of January, 2020, both days inclusive, the defendant did use a scanning device to access, read, obtain, memorize, or store, temporarily or permanently, information encoded on a payment card without the

No. 56856-0-II

> permission of the authorized user of the payment card, or with the intent to defraud the authorized user, another person, or a financial institution; and
> (2) That this act occurred in the State of Washington.

CP at 21.

Jury Instructions No. 7-14, pertaining to Counts III-X, stated in pertinent part:

> To convict the defendant of the crime of unlawful factoring of a credit card or payment card transaction as charged . . . each of the following elements of the crime must be proved beyond a reasonable doubt:
> (1) That on or about or between the 15th day of January, 2020 through the 6th day of April, 2020, both days inclusive, the defendant did use a scanning device to access, read, obtain, memorize, or store, temporarily or permanently, information encoded on a payment card without the permission of the authorized user of the payment card, or with the intent to defraud the authorized user, another person, or a financial institution; and
> (2) That this was a second or subsequent unlawful factoring of a credit card or payment card transaction; and
> (3) That this act occurred in the State of Washington.

CP at 22-29.

Jury Instruction No. 15 provided, "A separate crime is charged in each count. You must decide each count separately. Your verdict on one count should not control your verdict on any other count." CP at 30. Jury Instruction No. 16 stated:

> The State alleges that the defendant committed acts of Unlawful Factoring of a Credit Card or Payment Card Transaction on multiple occasions. To convict the defendant on any count of Unlawful Factoring of a Credit Card or Payment Card Transaction, one particular act of Unlawful Factoring of a Credit Card or Payment Card Transaction must be proved beyond a reasonable doubt, and you must unanimously agree as to which act has been proved. You need not unanimously agree that the defendant committed all the acts of Unlawful Factoring of a Credit Card or Payment Card Transaction.

CP at 31.

10

No. 56856-0-II

5.      Jury Verdict

The jury found Restvedt guilty of second degree theft (Count I).  The jury also found

Restvedt guilty of unlawful factoring of a credit card or payment card transaction as charged in

Counts III-VIII.  However, the jury found Restvedt not guilty of unlawful factoring of a credit card

or payment card transaction as charged in Count II, Count IX, and Count X.  The trial court polled

the jury, and each juror confirmed that the verdict was his or her verdict.  The trial court entered a

judgment and sentence, sentencing Restvedt to six months total confinement.[5]

Restvedt appeals.

ANALYSIS

A.    STANDARD OF REVIEW

We review challenges to sufficiency of the evidence "to determine whether, after viewing

the evidence in the light most favorable to the State, any rational trier of fact could have found

guilt beyond a reasonable doubt."  *State v. Sells*, 166 Wn. App. 918, 923, 271 P.3d 952 (2012),

*review denied*, 176 Wn.2d 1001 (2013).  A sufficiency challenge admits the truth of the State's

evidence and all reasonable inferences drawn therefrom.  *State v. Cardenas-Flores*, 189 Wn.2d

243, 265, 401 P.3d 19 (2017).  "Circumstantial and direct evidence are to be considered equally

reliable."  *Id.* at 266.  However, conflicting testimony and witness credibility are for the trier of

fact to determine and not subject to appellate review.  *State v. Homan*, 181 Wn.2d 102, 106, 330

---

[5]  After Restvedt's appeal to this court, he filed a motion for reconsideration of sentence to allow electric home monitoring.  The trial court granted the motion and entered an electric home detention order.

No. 56856-0-II

P.3d 182 (2014). Appellate courts will reverse convictions only when "'no rational trier of fact could find that all elements of the crime were proved beyond a reasonable doubt.'" *State v. Christian*, 200 Wn. App. 861, 864, 403 P.3d 925 (2017) (internal quotation marks omitted) (quoting *State v. Fedorov*, 181 Wn. App. 187, 194, 324 P.3d 784, *review denied*, 181 Wn.2d 1009 (2014)).

B.      UNLAWFUL FACTORING OF A CREDIT CARD OR PAYMENT CARD TRANSACTION

1.      Legal Principles

The State charged Restvedt under RCW 9A.56.290, which defines the crime of unlawful factoring of transactions. Under RCW 9A.56.290(1)(a), a person commits unlawful factoring of a credit card or payment card transaction if that person "[u]ses a scanning device to access, read, obtain, memorize, or store . . . information encoded on a payment card without the permission of the authorized user of the payment card or with the intent to defraud the authorized user, another person, or a financial institution."

A "credit card or payment card transaction" means "a sale or other transaction in which a credit card or payment card is used to pay for, or to obtain on credit, goods or services." RCW 9A.56.280(4). "Person" is defined as an "individual, partnership, corporation, trust, or unincorporated association, but does not include a financial institution or its authorized employees, representatives, or agents." RCW 9A.56.280(12). A "scanning device" is any "scanner, reader, or any other electronic device that is used to access, read, scan, obtain, memorize, or store, temporarily or permanently, information encoded on a payment card." RCW 9A.56.280(15). A "payment card" includes credit cards and debit cards. RCW 9A.56.280(11).

12

No. 56856-0-II

We review issues of statutory interpretation de novo. *State v. Thomason*, 199 Wn.2d 780, 787, 512 P.3d 882 (2022). The purpose of statutory interpretation is to give effect to the legislature's intent. *State v. Dennis*, 191 Wn.2d 169, 172, 421 P.3d 944 (2018). We derive legislative intent from the plain language of the statute, "considering the text of the provision in question, the context of the statute in which the provision is found, related provisions, and the statutory scheme as a whole." *Id.* at 172-73.

We may use dictionary definitions to discern the plain meaning of terms undefined by statute. *State v. Valdiglesias LaValle*, 23 Wn. App. 2d 934, 944, 518 P.3d 658 (2022). "When construing a statute, we must give effect to every word." *State v. Cathers*, 13 Wn. App. 2d 29, 33, 461 P.3d 375 (2020); *see also State v. Yusuf*, 21 Wn. App. 2d 960, 968, 512 P.3d 915, *review denied*, 200 Wn.2d 1011 (2022) ("[I]ndividual words should not be interpreted in isolation."). "[A] court should be 'reluctant to accept literal readings with . . . strained consequences, especially when they do not align with the statute's purpose and plain meaning of its text.'" *Yusuf*, 21 Wn. App. 2d at 968 (second alteration in original) (internal quotation marks omitted) (quoting *State v. Bergstrom*, 199 Wn.2d 23, 37, 502 P.3d 837 (2022)). If the text and context of a statute is clear, the analysis stops. *State v. Van Wolvelaere*, 195 Wn.2d 597, 600, 461 P.3d 1173 (2020). However, if "there is more than one reasonable interpretation of the plain language, then a statute is ambiguous." *Dennis*, 191 Wn.2d at 173. Courts may then "turn to statutory construction, relevant case law, and legislative history to discern legislative intent." *State v. Pratt*, 196 Wn.2d 849, 853, 479 P.3d 680 (2021).

No. 56856-0-II

2.      Insufficient Evidence of Unlawful Factoring

Restvedt argues that RCW 9A.56.290(1)(a) does not apply to his alleged conduct because he is not a "'merchant'" or "'commercial agent.'"  Br. of Appellant at 16, 17.  He asserts that the purpose of the statute under which he was charged is to "criminalize[] unlawful transactions by merchants" and "money laundering."  Br. of Appellant at 16.  Restvedt also asserts there is insufficient evidence in the record that he used a scanning device to access information encoded on Stirling's debit card without her authorization.  The State argues that RCW 9A.56.290(1)(a) applies to Restvedt's alleged conduct because Restvedt's interpretation that the statute applies only to "merchants and others within the financial realm is not supported by the plain language of the statute."  Br. of Resp't at 17.  Specifically, the State asserts that any individual's fraudulent conduct, not just those of merchants, is captured by the statutory language.  We agree with Restvedt that RCW 9A.56.290(1)(a) does not apply to his alleged conduct.

As a threshold matter, RCW 9A.56.290 criminalizes "unlawful factoring."  "Factoring" is not defined in the statute.  *See* RCW 9A.56.010, .280, .290.  This court may look to dictionary definitions to discern the plain meaning of undefined terms.  *Valdiglesias LaValle*, 23 Wn. App. 2d at 944.  "Factoring" is the "purchase of accounts receivable from a business by a factor who thereby assumes the risk of loss in return for some agreed discount."  WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 813 (2002).  A "factor" is "a person that acts or transacts business for another."  WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY at 813.  Based on these definitions, only a "factor" can engage in "factoring."  Therefore, the plain meaning of "unlawful factoring" is when a factor purchases or utilizes some sort of business account in an unlawful manner as delineated in the statute.

14

No. 56856-0-II

RCW 9A.56.290 does not use the term "factor" in defining who can commit the crime of unlawful factoring of a credit card or payment card transaction. Instead, the statute states that "[a] person commits the crime of unlawful factoring of a credit card or payment card transaction" under delineated circumstances. RCW 9A.56.290(1). However, a "person" is statutorily defined as not only an individual, but also a "partnership, corporation, trust, or unincorporated association." RCW 9A.56.280(12). The statutory definition of "person" is in keeping with the notion that RCW 9A.56.290 pertains to businesses, business conduct, and business accounts—in other words, the individual or entity conducting the business for another is the factor.

Here, the record shows that Restvedt was not regularly employed during the months at issue. During the trial, Restvedt testified, "I was doing small contracting jobs for neighbors and friends and those types of things." 1 VRP (Mar. 25, 2022) at 264. Even if Restvedt put himself forward as self-employed or as an independent contractor conducting business, there is no evidence that he, at any point, acted or transacted business for *another*. Therefore, there is insufficient evidence that Restvedt was a "factor." Because there is insufficient evidence that Restvedt was a factor, his alleged conduct, by definition, cannot fall within the definition of "unlawful factoring."

The State argues that to apply the statute so narrowly is "myopic." Br. of Resp't at 20. Specifically, the State contends that "[t]he conduct codified as unlawful by the legislature in RCW 9A.56.290 exceeds the narrow confines of the dictionary definition of factoring" and that we should give such definitions "minimal consideration." Br. of Resp't at 20, 21. The State then asserts that the record shows that Restvedt used Stirling's debit card to make unauthorized purchases at various merchant establishments and withdrawals using a cash register or ATM.

15

No. 56856-0-II

Therefore, according to the State, because cash registers and ATMs are electronic devices that can be used to "access, read, scan, obtain, memorize, or store" information encoded on a debit card, they are scanning devices, and Restvedt's conduct fits into the plain language of RCW 9A.56.290.

Even if we adopt the State's argument that Restvedt's use of Stirling's debit card fits within a literal reading of RCW 9A.56.290(1)(a) because Restvedt, a person, used a scanning device to access information encoded on Stirling's debit card to make unauthorized purchases or withdrawals, this literal reading ignores the term "factoring" in the statute. *See* RCW 9A.56.290(1). Courts should read and construe statutory provisions in their entirety. *Cathers*, 13 Wn. App. 2d at 33. Additionally, courts should avoid accepting literal readings with strained consequences, especially when those consequences do not align with the statute's purpose and plain meaning of its text. *Yusuf*, 21 Wn. App. 2d at 968. The State essentially asks for a literal reading of the statute while ignoring the key term, "factoring." Furthermore, had Restvedt taken Stirling's debit card and instead made unauthorized *online* purchases, no scanning device would have been involved, so he could not be charged or convicted under RCW 9A.56.290(1)(a) for what amounts to the same conduct—making unauthorized purchases. This is a strained, if not absurd, consequence of the State's literal reading of RCW 9A.56.290(1)(a).

And even if we accept the State's argument that the legislature intended a more expansive definition of factoring, the term "person" then becomes ambiguous. "Person" could mean a "factor," as discussed above, or it could mean *any* individual or non-financial institution entity engaged in *any* kind of unauthorized conduct, not just business conduct on behalf of another. A statute is ambiguous if there is more than one reasonable interpretation of the plain language.

16

No. 56856-0-II

*Dennis*, 191 Wn.2d at 173. When statutes are ambiguous, courts may turn to legislative history to discern legislative intent. *Pratt*, 196 Wn.2d at 853.

The legislature defined "unlawful factoring" in 1993 when it first introduced the bill containing the unlawful factoring statute:

> A business that wishes to accept credit cards from its customers must first enter into a merchant agreement with a financial institution. Credit card factoring occurs when a business that has a merchant agreement (the factor) processes the credit card transactions of a second business that has been unable or unwilling to obtain its own merchant agreement. In return, the second business pays a fee to the factor, which often is based on a percentage of the credit sales processed.

> It has been reported that certain "disreputable" operators use factoring in connection with schemes to defraud or deceive consumers. These deceptive transactions can produce significant losses to consumers who do not receive bargained-for products or services, and to financial institutions who must reimburse injured consumers.

> It has been suggested that criminalizing factoring used to facilitate unfair or deceptive trade practices would help to reduce the operations of "disreputable" businesses in this state.

S.B. REP. ON S.B. 5704, 53rd Leg., Reg. Sess. (Wash. 1993). The legislative history makes clear that the factoring statutes are intended to address unlawful merchant and business transactions, attempts to defraud financial institutions, and, as Restvedt argues, money laundering.

This interpretation is consistent with other jurisdictions' understanding of RCW 9A.56.290 and that of legal reference materials. *See, e.g.*, Minute Order re Motions in Limine, *DCR Mktg. Inc v. U.S. All. Grp., Inc.*, No. SACV 19-1897JVS, Ex. A at 23 (C.D. Cal. filed Aug. 18, 2022) (holding acts of laundering violate federal and state statutes, including RCW 9A.56.290); 81 AM. JUR. PROOF OF FACTS 3D *Identity Theft and Other Misuses of Credit and Debit Cards* § 7, 155

No. 56856-0-II

(2005) ("Another practice that some states make it a crime is factoring, the practice of a merchant sending in credit card drafts for a sale made by someone else.").

Indeed, Washington typically prosecutes unauthorized debit and credit card use under statutes prohibiting possessing stolen property, theft, and identity theft. *See, e.g.*, *Christian*, 200 Wn. App. at 862-63 (defendant prosecuted for theft and identity theft for using a stolen debit card to make purchases); *Sells*, 166 Wn. App. at 922 (defendant prosecuted for possession of stolen property and identity theft after stealing and using credit cards). Given both the plain language of the statute and the legislative history, and because there is no evidence in the record indicating that Restvedt was a factor, we hold there is insufficient evidence to convict Restvedt of any of his unlawful factoring charges. Accordingly, we reverse Restvedt's convictions of unlawful factoring under Counts III-VIII and remand to the trial court to dismiss those charges with prejudice. *State v. Majeed*, 14 Wn. App. 2d 868, 883, 474 P.3d 1085 (2020).

C.     EVIDENTIARY ERROR AND RIGHT TO PRESENT A DEFENSE

1.     Legal Principles

Trial courts determine the admissibility of evidence. *State v. Jennings*, 199 Wn.2d 53, 59, 502 P.3d 1255 (2022). Evidence must be relevant to be admissible. ER 402. Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." ER 401. "There is no constitutional right to admission of irrelevant evidence." *State v. O'Connor*, 155 Wn.2d 335, 349, 119 P.3d 806 (2005).

Witnesses may have their credibility impeached during cross-examination with specific instances of conduct, so long as the conduct is probative of the witness's truthfulness. ER 608(b).

18

No. 56856-0-II

In allowing such evidence, "the trial court may consider whether the instance of [conduct] is relevant to the witness's veracity on the stand and whether it is germane or relevant to the issues presented at trial." *O'Connor*, 155 Wn.2d at 349.

Appellate courts review trial court evidentiary rulings for abuse of discretion. *Jennings*, 199 Wn.2d at 59. "'A trial court abuses its discretion when its decision is manifestly unreasonable or exercised on untenable grounds or for untenable reasons.'" *State v. Arndt*, 194 Wn.2d 784, 799, 453 P.3d 696 (2019) (quoting *State v. Lord*, 161 Wn.2d 276, 283-84, 165 P.3d 1251 (2007)), *cert. denied*, 142 S. Ct. 726 (2021).

Criminal defendants have a constitutional right to present a defense. U.S. CONST. amend. VI; WASH. CONST. art. I, § 22; *Jennings*, 199 Wn.2d at 63. However, the right is not absolute. *Arndt*, 194 Wn.2d at 812. "Whether a Sixth Amendment right has been abridged presents a legal question that is reviewed de novo." *Id.* at 797. When a criminal defendant claims an evidentiary ruling violated his or her right to present a defense, appellate courts engage in a two-part analysis. *Jennings*, 199 Wn.2d at 58. Appellate courts "review the trial court's individual evidentiary rulings for an abuse of discretion and . . . consider de novo the constitutional question of whether these rulings deprived [the defendant] of [his] Sixth Amendment right to present a defense." *Arndt*, 194 Wn.2d at 797-98. Even if the trial court made a proper evidentiary ruling, that ruling could still violate a defendant's constitutional rights. *See Jennings*, 199 Wn.2d at 58.

To determine if a defendant's constitutional right has been violated, courts focus on whether the particular evidence at issue is a defendant's entire defense. *Id.* at 63. Specifically, "the State's interest in excluding evidence must be balanced against the defendant's need for the information sought to be admitted." *Arndt*, 194 Wn.2d at 812.

19

No. 56856-0-II

2. No Evidentiary Error

Restvedt argues that his counsel "was improperly barred from impeaching Ms. Stirling's credibility by inquiring as to whether, and how many times, Ms. Stirling had used different names." Br. of Appellant at 22. Specifically, Restvedt asserts Stirling's use of "different names" was probative of her truthfulness and he had a "good faith basis for the inquiry." Br. of Appellant at 22-23. The State argues that the trial court did not abuse its discretion because the information Restvedt sought was collateral. The State also argues that the evidence Restvedt sought was ultimately admitted during the State's rebuttal, and therefore there was no error. We agree with the State.

Restvedt contends that he and Stirling ended their relationship because Stirling was "continually dishonest" and that dishonesty extended to Stirling's "names and who she was or is currently married to." 1 VRP (Mar. 24, 2022) at 139. When Restvedt's counsel attempted to ask Stirling about her name, the State objected. After excusing the jury, the trial court repeatedly asked Restvedt's counsel how Stirling's name change was relevant to her credibility. Restvedt's counsel ultimately answered, "Well, you know, quite honestly, Your Honor, I'm just trying to make her look like a liar. That's the bottom line." 1 VRP (Mar. 24, 2022) at 141. The trial court acknowledged Restvedt's trial strategy, but noted that Restvedt's counsel did not have any offer of proof of when Stirling changed her name or how many times she had changed her name.

Here, the issue was whether or not Restvedt used Stirling's debit card to make unauthorized purchases or withdrawals. Because of much of the evidence against Restvedt is based on Stirling's testimony, her credibility as a witness is relevant. Furthermore, Restvedt and Stirling dispute the cause of their breakup. Restvedt claims the breakup was precipitated by confrontation over

20

No. 56856-0-II

Stirling's past marriage. Stirling testified that the relationship ended due to ongoing issues and "financial abuse." 1 VRP (Mar. 25, 2022) at 289. However, as the trial court pointed out, evidence of Stirling's name is "classic collateral evidence—a trial within a trial." 1 VRP (Mar. 24, 2022) at 141. Moreover, the trial court has discretion in its admission of evidence. ER 608(b).

The record shows that the trial court gave Restvedt's counsel multiple opportunities to explain how Stirling's name change and past marriage were germane or relevant to the issues at trial. Because Restvedt's counsel could not provide an answer to the trial court other than argue that Stirling's name change and past marriage related to her credibility, and because there was no offer of proof to support Restvedt's claims relating to Stirling's name change and marriage dates, the trial court did not abuse its discretion when it denied Restvedt's counsel from impeaching Stirling about her name change and marriage dates.[6] Accordingly, we hold the trial court did not abuse its discretion.

3.     No Violation of Right to Present a Defense

Restvedt argues that his right to present a defense was violated when the trial court blocked the inquiry about Stirling's name change and marriage because it "was necessary to and would have sought to show that Ms. Stirling was a liar." Br. of Appellant at 27. Restvedt asserts his defense was "predicated on the argument that Ms. Stirling . . . knowingly and purposefully [made]

---

[6] Even if the trial court had abused its discretion, Stirling later testified about her past marriage and name change. Stirling was married from 1995 to 2004, and she has been using the surname "Stirling" for approximately 20 years. 1 VRP (Mar. 25, 2022) at 290. Because the information Restvedt sought was ultimately admitted, any error was harmless. *See State v. Aguilar*, 153 Wn. App. 265, 275, 223 P.3d 1158 (2009), *review denied*, 168 Wn.2d 1022 (2010).

21

No. 56856-0-II

false accusations against Mr. Restvedt" and his inability to attack her credibility was constitutional error. Br. of Appellant at 27. We disagree.

Again, the issue at trial was whether Restvedt made unauthorized purchases or withdrawals with Stirling's debit card. And during trial, Restvedt's counsel appropriately attempted to create questions of fact as to whether and if it was possible for Restvedt to have taken and used Stirling's debit card without permission—especially because Stirling never witnessed Restvedt doing so. Therefore, Restvedt had opportunity to attack, and did attack, Stirling's credibility. In light of this, the record is clear that Restvedt's defense did *not* hinge on evidence of Stirling's name change or marriage.

Furthermore, the evidence Restvedt sought was ultimately admitted, so the jury could make the credibility determination that Restvedt desired. Because Restvedt's inquiry into Stirling's name change or marriage was not his entire defense, he was able to attack Stirling's credibility in other ways, and because the evidence was ultimately admitted, there is no constitutional violation.

D.   PROSECUTORIAL MISCONDUCT

1.      Legal Principles

In claims of prosecutorial misconduct, "the defendant bears the burden of proving that the prosecutor's conduct was both improper and prejudicial." *State v. Emery*, 174 Wn.2d 741, 756, 278 P.3d 653 (2012). A defendant must first show that the prosecutor's statements are improper. *Id.* at 759. Improper statements include those that shift the burden of proof to the defendant in a criminal proceeding. *Id.* at 759-60; *accord State v. Thorgerson*, 172 Wn.2d 438, 453, 258 P.3d 43 (2011) ("[I]t is improper for the prosecutor to argue that the burden of proof rests with the defendant.").

22

No. 56856-0-II

"Once a defendant establishes that a prosecutor's statements are improper, [the court] determine[s] whether the defendant was prejudiced under one of two standards of review." *Emery*, 174 Wn.2d at 760. If the defendant objected at trial, he or she must show that the prosecutor's misconduct "resulted in prejudice that had a substantial likelihood of affecting the jury's verdict." *Id.* Alternatively, if the defendant did not object at trial, "the defendant is deemed to have waived any error, unless the prosecutor's misconduct was so flagrant and ill intentioned that an instruction could not have cured the resulting prejudice." *Id.* at 760-61. If the latter standard applies, the defendant must show that no curative instruction would have prevented any prejudicial effect and that the prejudice had a substantial likelihood of affecting the jury verdict. *Id.* at 761.

2.      No Prosecutorial Misconduct

Restvedt argues that the State improperly shifted the burden of proof to him because the State argued that Restvedt should have produced evidence of Stirling's dishonesty. We disagree.

The State bears the burden of proving every element of a crime beyond a reasonable doubt. *Christian*, 200 Wn. App. at 864. Here, Restvedt objects to the prosecutor's statement during closing arguments that Restvedt could have found out on his own that Stirling had been married. Restvedt claims the State "faulted [him] for not securing evidence to prove his account of the fractious end to the relationship resulting in the vindictive repercussions of criminal accusation he suffered." Br. of Appellant at 31. However, how exactly Restvedt and Stirling's relationship ended was not at issue during trial. And the prosecutor was speaking to Restvedt's and Stirling's credibility in light of their conflicting stories. The prosecutor did not convey to the jury that Restvedt needed to prove his version of events to be found not guilty.

23

No. 56856-0-II

"[A] prosecutor has wide latitude to argue reasonable inferences from the evidence." *Thorgerson*, 172 Wn.2d at 453. Given the context of the testimony the jury had just heard—that Stirling had been married over a decade before she even met Restvedt—it is reasonable to infer that that fact alone would not have precipitated the breakup of a four-year relationship.

The prosecutor did not shift the burden to Restvedt to present evidence. Therefore, the prosecutor's challenged statements during closing arguments were not improper.

E. CUMULATIVE ERROR

The cumulative error doctrine applies when a combination of trial errors denies the defendant a fair trial, even if any one of those errors individually may not justify reversal. *In re Det. of Coe*, 175 Wn.2d 482, 515, 286 P.3d 29 (2012). "'The test to determine whether cumulative errors require reversal of a defendant's conviction is whether the totality of circumstances substantially prejudiced the defendant and denied him a fair trial.'" *Rookstool v. Eaton*, 12 Wn. App. 2d 301, 311, 457 P.3d 1144 (2020) (quoting *In. Pers. Restraint of Cross*, 180 Wn.2d 664, 690, 327 P.3d 660 (2014)). A defendant may not claim cumulative error as a way to address unpreserved issues on appeal. *Id.* at 311.

Here, because the trial court did not commit any evidentiary or constitutional error, and because there was no prosecutorial misconduct, the cumulative error does not apply. Restvedt's cumulative error claim fails.

CONCLUSION

Because there is insufficient evidence that Restvedt committed unlawful factoring under RCW 9A.56.290, we reverse Restvedt's convictions of unlawful factoring of a credit card or payment card transaction (Counts III-VIII). Restvedt's other challenges on appeal are not

24

No. 56856-0-II

persuasive. Therefore, we reverse Restvedt's convictions of unlawful factoring of a credit card or payment card transaction, affirm Restvedt's conviction of theft in the second degree, and remand for the trial court to dismiss the unlawful factoring of a credit card or payment card transaction charges with prejudice and for resentencing.

_____
Lee, P.J.

We concur:

_____
Price, J.

_____
Che, J.

25