IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | No. 38848-4-III |
| | ) | |
| Respondent, | ) | |
| | ) | |
| v. | ) | UNPUBLISHED OPINION |
| | ) | |
| KYLE ANTHONY JOHNSON-CLARK, | ) | |
| | ) | |
| Appellant. | ) | |

PENNELL, J. — Kyle Anthony Johnson-Clark appeals his conviction for first degree murder with a firearm enhancement. We affirm.

## BACKGROUND

On May 3, 2019, Kyle Anthony Johnson-Clark shot and killed Damien Rice following a series of events that occurred between Mr. Johnson-Clark, Mr. Rice, and a woman named Bethany Fristed.[1] The facts surrounding the shooting are contested, so

---

[1] Bethany Fristed and her sister, Brittney Fristed, were both witnesses in this case. To avoid confusion, we refer to the women by their given names. No disrespect is intended.

we first summarize the facts gathered by the State prior to Mr. Johnson-Clark's arrest.

Then we address the trial process and trial. Finally, we briefly summarize information

gathered by Mr. Johnson-Clark's attorney after trial.

*Pre-arrest facts*

Mr. Johnson-Clark and Bethany started dating in early 2019. At some point during

the relationship, Bethany also had a romantic relationship with Mr. Rice. Bethany and

Mr. Rice were heavy drug users, and Mr. Rice provided her with drugs. Mr. Rice lived

next door to Bethany and her father in West Richland.

On April 25, 2019, Bethany and Mr. Johnson-Clark engaged through a series of

Facebook messages regarding their relationship and Mr. Johnson-Clark's suspicion that

Bethany was seeing another man. Mr. Johnson-Clark had two Facebook accounts under

the usernames "Michael Peterson" and "Yourè Psychö." 1 Rep. of Proc. (RP) (Jan. 20,

2022) at 474; 2 RP (Jan. 20, 2022) at 574.[2] Mr. Johnson-Clark addressed the man he

suspected of having a relationship with Bethany and wrote, "I'm gonna kill him."

Ex. 132E at 26. Initially, Mr. Johnson-Clark indicated he suspected the other man was

---

[2] During the State's case-in-chief at trial, counsel for Mr. Johnson-Clark objected
to the authenticity of the messages. But during his testimony, Mr. Johnson-Clark admitted
that he had authored the messages sent from the "Michael Peterson" and "Yourè Psychö"
accounts.

someone named "Jared." *Id.* at 26-27. But then he wrote that he recognized it was

"Da iel," i.e., Daniel Rice, explaining, "I put 2n2 together." *Id.* at 28. Mr. Johnson-Clark

instructed Bethany to "End it." *Id*. Mr. Johnson-Clark repeatedly wrote that Mr. Rice

was "green lit." *Id.* at 29-30. He also wrote, "He's dead." *Id.* at 30. The term "green lit"

means a permission has been given to kill a specific target. 2 RP (Jan. 24, 2022) at 894.

On the same date as Mr. Johnson-Clark's messages with Bethany, he also sent

some Facebook messages to Mr. Rice. Mr. Johnson-Clark threatened Mr. Rice, stating:

> Damn homie so u tried to snake me for my bitch??? Ur green lit by ab[3] so
> the joint is all bad for u an when would watch over ur shoulder player. Keep
> that shit on u an watch every car the silver bmw is gone tonight it's being
> sold ima catch us with u plater.

Ex. 132D at 1. And he continued in another message:

> Smh u should have just took my advice fam this was the worst decision u
> could of made I see u aint no punk an I'm glad homie u don't have to be
> a punk tho to get hollered at by my bros. Idgaf if us pop me ur threw fam.
> Idk what all y know about the brand but I promise you are gonna know
> more here shortly it's piece of shit white boys like u that are the issue now
> days I hope that pussy was worth it.

*Id.*

---

[3] At trial, Detective Hyrum Stohel of the Richland Police Department testified
"ab" means "Aryan Brotherhood." 2 RP (Jan. 24, 2022) at 899-900.

At around the same time as the Facebook Messenger exchanges, Mr. Johnson-Clark stole a 9mm handgun from his cousin. Also around this time, Mr. Johnson-Clark and Bethany left West Richland and began staying with Bethany's sister Brittney at the Columbia Park Apartments in Richland.

On May 3, 2019, Mr. Johnson-Clark and Bethany were together at Brittney's apartment. Mr. Rice was also at the apartment complex helping his friends, Jeramie Vannauker and Sarah Morse, move some belongings into Mr. Vannauker's daughter's apartment. The trio had arrived in a truck that was owned by Mr. Rice's stepfather.

While Mr. Vannauker and Ms. Morse were upstairs inside the daughter's apartment, they heard gunshots. Mr. Vannauker hurried downstairs and ran around, looking for Mr. Rice. Mr. Vannauker found Mr. Rice laying on the ground, with "blood [coming] out of his head." 3 RP (Jan. 24, 2022) at 1108. He yelled for someone to call 911. By that point, Ms. Morse had come downstairs. She called 911 while trying to comfort Mr. Rice. Several neighbors also came outside and were contacting the authorities. No one at the scene reported seeing the shooting, although one of the neighbors said they noticed a male running in the direction of Chief Joseph Middle School and others heard car tires squealing from that same general direction. 1 RP (Jan. 20, 2022) at 447; 2 RP (Jan. 20, 2022) at 534, 734.

Before the authorities arrived, Mr. Vannauker removed a methamphetamine pipe from Mr. Rice's truck and disposed of it in a nearby dumpster. The police later found the pipe during a search, and Mr. Vannauker explained that he had been using methamphetamine earlier in the day and did not want to get in trouble. 3 RP (Jan. 25, 2022) at 1109-10.

When emergency responders arrived, they found Mr. Rice to be largely nonresponsive. He had suffered three gunshot wounds, one each to the head, arm, and shoulder. According to the autopsy report, all three shots had entered Mr. Rice's body from behind. Law enforcement recovered seven shell casings from the area. According to a forensic analysis, all seven casings were expelled from the same firearm. Law enforcement did not find any guns or weapons on Mr. Rice's body. A pellet gun was recovered from Mr. Rice's truck. Mr. Rice was found to have significant levels of amphetamine and methamphetamine in his system.

The day after the shooting, Brittney and Bethany went to the police. Brittney reported that she had received a call from Mr. Johnson-Clark the night before, asking her to pick him up at Chief Joseph Middle School. Brittney acceded to this request and drove to the school with her boyfriend and children. Once Brittney got to the school, Mr. Johnson-Clark jumped into her car and directed her to drive to the Snyder boat

launch. At the boat launch, Mr. Johnson-Clark got out of the car and disappeared from view. Mr. Johnson-Clark then got back into the car and asked Brittney to take him to Walmart. 2 RP (Jan. 21, 2022) at 788. Brittney dropped Mr. Johnson-Clark off at the Walmart, then drove home to her apartment, and then went to her father's house in West Richland. While at her father's, Brittney received a call from Bethany, asking if Brittney could help buy some "stuff for laundry soap." *Id*. at 789. Brittney went to Walmart and found Bethany together with Mr. Johnson-Clark. The group bought some bleach and then Brittney left to go back to her father's house. According to Brittney, she did not learn about the shooting until the next day. *Id*. at 791.

Bethany then met with the police. She provided information suggesting Mr. Johnson-Clark had shot Mr. Rice in self-defense. She claimed she had received a message from Mr. Rice shortly before the shooting saying words to the effect, "'Don't be scared of my next move.'" 3 RP (Jan. 26, 2022) at 1235. Bethany also said that she saw Mr. Rice the day of the shooting. During this interaction, Mr. Rice looked at Bethany, smiled, and raised his shirt to show "he had a gun in [his] waistband." *Id*. at 1236. Bethany claimed Mr. Rice had numerous guns in his truck and that she had advised Mr. Johnson-Clark of her observations.

Bethany returned to talk to the police on May 9, 2019. *Id*. at 1239.[4] She told the

authorities she wanted to tell the truth and that her previous statement was essentially

comprised of "the words of Kyle Johnson-Clark." *Id*. at 1239-40. Bethany said she was

afraid of Mr. Johnson-Clark because he was abusive and had not yet been apprehended.

She explained that while she did not witness the shooting, she did hear gunshots and then

saw Mr. Rice attempting to run toward the laundry room of the apartment complex. She

said that the bleach purchased from Walmart had been used to clean gun residue from

Mr. Johnson-Clark's hands. She also said Mr. Johnson-Clark had directed her to drive

around so she could hide the bleach bottle, his cell phone, and various items of clothing.

After talking to Brittney and Bethany, law enforcement recovered several pieces

of evidence. Officers found a bleach bottle, cell phone, and clothing in the areas that had

---

[4] Mr. Johnson-Clark asserts "Bethany testified she was pressured by [Jeramie] Vannauker to 'give a different story.'" Reply Br. of Appellant at 12. This is inaccurate. During cross-examination, Bethany agreed with defense counsel that she ran into Mr. Vannauker after her initial police interview. 2 RP (Jan. 21, 2022) at 639. She did not specify whether this was before her second police interview. Bethany agreed that Mr. Vannauker was one of her "retaliators." *Id*. But she never agreed that Mr. Vannauker threatened her or told her what to say. During cross-examination, Bethany explained that she went back to the police to "give [them] a different story," specifically "[i]t wasn't a story that was being coached." *Id.* at 641. Law enforcement explained that when Bethany came in on May 9 she wanted to "give [them] the truth." 3 RP (Jan. 26, 2022) at 1239. She said the "interview she provided on May 4th were the words of Kyle Johnson-Clark, and she wanted to give [law enforcement] hers, the real story." *Id*. at 1239-40.

been identified by Bethany during her May 9 interview. And, consistent with Brittney's

statement, a handgun and magazine were located in the vicinity of the Snyder boat launch.

The handgun was determined to be the one stolen from Mr. Johnson-Clark's cousin. It

was also consistent with the gun used to shoot and kill Mr. Rice.

Mr. Johnson-Clark fled the area after the shooting. A warrant was issued for his

arrest and he was eventually located during July 2019 in St. Louis, Missouri.

*Pretrial procedure and trial*

The State charged Mr. Johnson-Clark with first degree murder with a firearm

enhancement, possession of a stolen firearm, and unlawful possession of a firearm in the

second degree. Prior to trial, Mr. Johnson-Clark pleaded guilty to the two firearm charges.

During the pretrial and trial process, the court addressed three legal issues

pertinent to this appeal. First, the trial court admitted the Facebook messages attributed

to Mr. Johnson-Clark through the "Michael Peterson" and "Yourè Psychö" accounts.

Second, the trial court ruled the State could impeach Mr. Johnson-Clark with his stolen

firearm conviction because it was admissible "as a crime of dishonesty." 3 RP (Jan. 26,

2022) at 1337. And third, the trial court issued an initial aggressor instruction under

WPIC 16.04.[5] 3 RP (Jan. 27, 2022) at 1424-25.

At trial, the State's evidence was largely consistent with the foregoing summary. None of the State's witnesses testified to ever seeing Mr. Rice with a gun. According to Bethany's testimony, she heard gunshots on May 3 and then looked through a window to see Mr. Rice outside the truck, being followed by Mr. Johnson-Clark. 2 RP (Jan. 20, 2022) at 564-65. Mr. Rice's hands were up and he was stumbling as he tried to run away. *Id*. at 565. Bethany did not see anything in Mr. Rice's hands, although his hands were not entirely visible to her. It appeared to Bethany that Mr. Rice was trying to get to the laundry room door of the apartment complex. Bethany heard gunshots as she saw Mr. Johnson-Clark walking toward Mr. Rice. *Id*. at 566-67.

Several neighbors testified at trial. One of them said he thought he heard the sounds of two different firearms and that he heard someone say something like, "'Did you hide the gun?'" 2 RP (Jan. 21, 2022) at 764. However, this neighbor was uncertain about his memory and his statements were not corroborated by any other witness or by an audio recording captured by the Nest doorbell system of one of the neighbors.

---

[5] 11 WASHINGTON PRACTICE: WASHINGTON PATTERN JURY INSTRUCTIONS: CRIMINAL 16.04, at 256 (4th ed. 2016).

Mr. Johnson-Clark presented testimony from his friend, Michael Burress, who testified that he had an interaction with Mr. Rice several days before the shooting. According to Mr. Burress, he was driving Bethany's car when he was approached by a vehicle driven by Mr. Rice with Mr. Vannauker and Ms. Morse riding as passengers. Mr. Rice approached Mr. Burress's car and seemed agitated. But then he relaxed when he saw Mr. Burress, commenting, "'Oh, I thought you were [Mr. Johnson-Clark].'" 3 RP (Jan. 26, 2022) at 1252. Mr. Burress testified that he alerted Mr. Johnson-Clark to this interaction with Mr. Rice. According to Mr. Buress, he told Mr. Johnson-Clark that Mr. Rice was looking for Mr. Johnson-Clark and that Mr. Rice appeared to be armed. *Id*. at 1254-55.

Mr. Johnson-Clark also testified on his own behalf. He claimed he was not jealous of Mr. Rice and Bethany. Instead, he was simply concerned that Mr. Rice was supplying Bethany with methamphetamine. According to Mr. Johnson-Clark, he became fearful of Mr. Rice after an incident where Mr. Rice tried to sell him a gun. Mr. Johnson-Clark testified that friends had told him Mr. Rice was a violent gang member. *Id*. at 1304. Mr. Johnson-Clark testified he stole his cousin's gun and moved with Bethany into Brittney's apartment in order to avoid Mr. Rice. According to Mr. Johnson-Clark, Mr. Rice would drive by Brittney's apartment in an apparent effort to show that he

10

knew where Bethany and Mr. Johnson-Clark were staying. On the day of the shooting, Mr. Johnson-Clark testified that Bethany told him Mr. Rice was at the apartment complex and was armed with a gun. *Id*. at 1310.

Mr. Johnson-Clark testified that he armed himself with his gun and went outside to find Mr. Rice in order to "diffuse the situation." *Id*. at 1315-16. When Mr. Johnson-Clark encountered Mr. Rice, he saw that Mr. Rice was clenching his jaw, rolling his shoulders, sweating, and his pupils "were the size of quarters." *Id*. at 1316. According to Mr. Johnson-Clark, Mr. Rice was agitated and pulled out what Mr. Johnson-Clark believed was a gun. Mr. Johnson-Clark then fired a shot and ducked. He saw Mr. Rice turn away, but he claimed Mr. Rice's gun arm was still pointed at him. So Mr. Johnson-Clark turned and shot and then ran away.

Mr. Johnson-Clark agreed Brittney had picked him up at Chief Joseph Middle School, but he claimed that Brittney took the gun away from him. Mr. Johnson-Clark denied ever going to the Snyder boat launch. Mr. Johnson-Clark admitted he was with Bethany and Brittney at Walmart when they purchased some bleach. But he claimed he did not know what the bleach was for and he denied using it to clean his hands. According to Mr. Johnson-Clark he fled the area because he was scared.

11

Mr. Johnson-Clark denied he had ever been abusive to Bethany and he denied

sending any threatening messages to Mr. Rice. According to Mr. Johnson-Clark, the

language used in his Facebook messages to Mr. Rice was just puffery. He claimed he

did not know what "green lighting" meant. *Id*. at 1299. He merely used the term because

he had heard it in the movies. *Id*. He also denied being associated with the Aryan

Brotherhood. *Id*. at 1300.

During summation, the State's prosecuting attorney argued the case was about

credibility. The State pointed out that the testimony from its witnesses had been

corroborated, but the same was not true for Mr. Johnson-Clark. The State also argued

Mr. Johnson-Clark was less credible than other witnesses due to his criminal history.

The prosecutor repeatedly pointed out that Mr. Johnson-Clark was the only witness who

had a prior conviction for a "crime of dishonesty." 3 RP (Jan. 27, 2022) at 1467-68. The

prosecutor also argued Brittney testified credibly because she called the police, noting

"[i]sn't that what an honest person who's telling the truth is gonna do?" *Id*. at 1468.

Defense counsel did not object to the prosecutor's arguments.

The jury found Mr. Johnson-Clark guilty of first degree murder with a firearm

enhancement. The trial court sentenced Mr. Johnson-Clark to 407 months in prison,

the high end of the standard range.

*Posttrial developments*

At some point after trial, Mr. Johnson-Clark's appellate attorney discovered that several of the State's witnesses had previously been convicted of crimes of dishonesty, including Brittney Fristed, Sarah Morse, and Jeramie Vannauker. Based on the dates of conviction, none of the witnesses' prior crimes were recent enough to be admissible under ER 609(b). However, further investigation revealed that Jeramie Vannauker had been released from custody on one of his offenses during the 10-year period of admissibility set forth under ER 609(b). This meant Mr. Vannauker could have been impeached under ER 609 with his prior conviction. The record is silent as to whether trial counsel for either the State or Mr. Johnson-Clark had been aware of the admissibility of Mr. Vannauker's prior conviction.

ANALYSIS

*Facebook messages*

Mr. Johnson-Clark argues that the Facebook messages from the "Michael Peterson" and "Yourè Psychö" accounts should not have been admitted into evidence because they were not authenticated. We disagree.

"The requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in

question is what its proponent claims." ER 901(a). An electronic message may be authenticated through the testimony of a person with knowledge that: (1) the message purports to have been authored by the sender, (2) the message purports to be sent from an account associated with a particular sender, and (3) the characteristics of the message, together with other circumstances, support finding the message is what the proponent claims. *See* ER 901(b)(1). We review a trial court's decision to admit evidence for abuse of discretion. *State v. Bashaw*, 169 Wn.2d 133, 140, 234 P.3d 195 (2010).

The trial court did not abuse its discretion in admitting the Facebook messages over an authenticity objection. Bethany Fristed testified Mr. Johnson-Clark used the "Michael Peterson" and "Yourè Psychö" accounts to communicate with her. Mr. Johnson-Clark's cousin also identified the "Michael Peterson" account as one used by Mr. Johnson-Clark. Notably, the "Michael Peterson" account was the one used to communicate with Mr. Rice. The content of the "Michael Peterson" and "Yourè Psychö" accounts supported the conclusion that both were used by Mr. Johnson-Clark. The accounts included photographs of Mr. Johnson-Clark. The messages on the accounts were consistent with Mr. Johnson-Clark communicating with Bethany Fristed about their relationship and his jealousy of, and anger toward, Mr. Rice. Ample evidence supports the trial court's decision to admit the Facebook messages.

14

We note that there is no serious dispute on appeal that the messages from both

Facebook accounts were actually authored by Mr. Johnson-Clark. During his testimony,

Mr. Johnson-Clark admitted that he wrote the messages attributed to him by virtue of

the two accounts. The parties do not address whether Mr. Johnson-Clark waived his

authenticity objection by agreeing to authenticity during his testimony. Accordingly,

we do not address this issue.

*Prosecutorial misconduct*

Mr. Johnson-Clark contends the prosecutor committed misconduct in his

closing argument by (1) misleading the jury about the witnesses' criminal histories,

(2) vouching for Brittney Fristed's credibility, and (3) mischaracterizing the trial court's

jury instruction that prior crimes could only be considered in deciding credibility.

Mr. Johnson-Clark did not object to the prosecutor's statements at trial. Thus, relief

on appeal requires him to show that the prosecutor's actions were "so flagrant and ill

intentioned that an instruction could not have cured the resulting prejudice." *State v.

Emery*, 174 Wn.2d 741, 760-61, 278 P.3d 653 (2012). We reject these arguments and

address each claim in turn.

(1) *Witnesses' criminal histories*

Mr. Johnson-Clark contends the State's prosecutor misled the jury when they

argued Mr. Johnson-Clark was the only witness who had a previous conviction for a crime of dishonesty. Referring to information gathered postconviction, Mr. Johnson-Clark points out that several of the State's witnesses had prior crimes of dishonesty on their records. Mr. Johnson-Clark appears to acknowledge that, for most of the State's witnesses, the prior crimes were too old to be admissible under ER 609(b).[6] However, one of the State's witnesses—Jeramie Vannauker—was incarcerated for a crime of dishonesty during the 10-year period prior to his testimony. Thus, even though no one impeached Mr. Vannauker with his prior conviction at trial, evidence of his prior conviction could have been elicited under ER 609(b).

We first note there is no evidence the State's prosecutor was aware Mr. Vannauker had been incarcerated for his prior conviction within the 10-year time period contemplated by ER 609(b). Mr. Vannauker's incarceration appears to have been

---

[6] Mr. Johnson-Clark makes this acknowledgment in his opening brief. But in his reply brief he argues all of the witnesses' prior convictions were admissible, despite being over 10 years old, because the trial court could have admitted the convictions under ER 609(b). This argument, made for the first time in the reply brief, mischaracterizes the applicable rule. Under ER 609(b), "evidence of a conviction more than 10 years old . . . *is not admissible*" unless the proponent provides pretrial notice and the trial court makes a finding that the probative value of the conviction "substantially outweighs its prejudicial effect." *Id.* (emphasis added). Here, there was no pretrial request for admission. Nor is there any reason to think that the trial court would have admitted the convictions had a request been made. The convictions were not admissible under ER 609.

attributable to the revocation of a drug offender sentencing alternative (DOSA) in 2013.

This was less than 10 years before the 2022 trial date. But there is no evidence the

prosecutor was aware at the time of trial of the DOSA revocation. We will not assume

the State's prosecutor was aware of the DOSA revocation or the potential admissibility

of Mr. Vannauker's prior conviction. Rather, we assume that the prosecutor believed

Mr. Vannauker's prior conviction, like those of the other State witnesses, was

inadmissible under ER 609(b). If Mr. Johnson-Clark has evidence outside the record

on review that the prosecutor was aware of the admissibility of Mr. Vannauker's prior

conviction, he may raise that issue in a personal restraint petition. *See State v.

McFarland*, 127 Wn.2d 322, 335, 899 P.2d 1251 (1995).[7]

At trial, Mr. Johnson-Clark was the only witness who was impeached with a

prior crime of dishonesty pursuant to ER 609. Before impeaching Mr. Johnson-Clark,

the prosecutor addressed the issue with the court and sought permission to impeach

Mr. Johnson-Clark with his stolen firearm conviction. Mr. Johnson-Clark's trial attorney

---

[7] For this reason, we also reject Mr. Johnson-Clark's claim that his trial attorney performed deficiently by failing to impeach Mr. Vannauker with evidence of his prior conviction. There is nothing in the record suggesting Mr. Vannauker's trial counsel knew, or should have known, that Mr. Vannauker's prior conviction would have been admissible under ER 609. If Mr. Johnson-Clark has evidence to the contrary, that can be developed through a personal restraint petition. *McFarland*, 127 Wn.2d at 335.

agreed that the conviction appeared to be a crime of "dishonesty" and was "fair game."

3 RP (Jan. 26, 2022) at 1337. The court concurred with the parties' assessment and ruled

the conviction "comes in as a crime of dishonesty" and that the prosecutor could impeach

Mr. Johnson-Clark with his stolen firearm conviction. *Id*.

The trial court instructed the jury on the issue as follows:

> You may consider evidence that [Mr. Johnson-Clark] has been
> convicted of a crime only in deciding what weight or credibility to give to
> [Mr. Johnson-Clark]'s testimony. You may not consider it for any other
> purpose. Any discussion of the evidence during your deliberations must be
> consistent with this limitation.

Clerk's Papers at 735 (jury instruction 5).

In arguing the State's case to the jury, the prosecutor pointed out that Mr. Johnson-

Clark was the only witness with a prior crime of dishonesty and that this fact should be

used in assessing Mr. Johnson-Clark's credibility. The prosecutor argued:

> In other words, *[Mr. Johnson-Clark] has less credibility than all the
> other witnesses because of his prior conviction*, and that's what the Court
> just instructed you. That you can consider that. Not that you have to, but it's
> something for you to consider.

3 RP (Jan. 27, 2022) at 1467 (emphasis added).

> Ask yourself, was there any other witness—all these other witnesses, by
> the way, who contradict [Mr. Johnson-Clark]'s testimony, *did any of these
> other witnesses who testified have a crime of dishonesty? Nope.
> Let's start with Brittney Fristed. Nope, she didn't.*

18

*Id*. at 1467-68 (emphasis added).

> Now, let's compare that to [Mr. Johnson-Clark]'s story. *A story that we can examine for credibility due to the fact that he has a conviction for a crime of dishonesty* and a motive to lie, and a continuing story that is contradicted again and again and again by *every other witness who testified in this trial*.

*Id*. at 1468 (emphasis added).

A prosecutor has "wide latitude in making arguments to the jury" and to draw reasonable inferences therefrom. *State v. Gregory*, 158 Wn.2d 759, 860, 147 P.3d 1201 (2006), *overruled on other grounds by State v. W.R.*, 181 Wn.2d 757, 336 P.3d 1134 (2014). A prosecutor is also allowed to argue their case and explain how the trial court's jury instructions support their theory of conviction. Nevertheless, neither the prosecutor nor any other attorney may misuse the trial process to mislead the jury about facts not in evidence. *See State v. Reeder*, 46 Wn.2d 888, 892, 285 P.2d 884 (1955); RPC 3.3(a)(1).

Here, it is uncontested that Mr. Johnson-Clark was the only witness who had been impeached with a prior crime of dishonesty. And the court's instructions stated that Mr. Johnson-Clark's prior conviction was relevant to assessing his credibility. Given these circumstances, the prosecutor was absolutely entitled to argue Mr. Johnson-Clark's credibility and point out ways in which he was different from other witnesses. Mr. Johnson-Clark points to no authority suggesting otherwise.

Mr. Johnson-Clark's criticism stems from the wording of the prosecutor's argument. According to Mr. Johnson-Clark, the way in which the prosecutor argued credibility could have been interpreted to suggest that none of the witnesses besides Mr. Johnson-Clark had ever been convicted of a crime of dishonesty, regardless of inadmissibility.[8] This would have been improper, he argues, because it would have been a misstatement of fact and it would have referenced facts outside the record.

To the extent Mr. Johnson-Clark believed the prosecutor's comments referenced inaccurate facts outside the record, it could have been cured by a timely objection. We recognize that prosecutorial misconduct can be deemed incurable if repeated. *See State v. Loughbom*, 196 Wn.2d 64, 73-78, 470 P.3d 499 (2020). But here, the prosecutor's statements were confined to summation; they did not frame the entire case *Cf. id*. at 75 (The "prosecutor's improper framing of [Mr.] Loughbom's prosecution as *representing* the war on drugs, and his reinforcing of this theme throughout, caused incurable prejudice."). Furthermore, the prosecutor's comments here were aimed at a proper purpose. Mr. Johnson-Clark was the only witness who had been impeached at trial with

---

[8] In his reply brief, Mr. Johnson-Clark takes a stronger stance arguing, "This was a lie, the prosecutor knew it was a lie, and he said it anyway." Reply Br. at 5-6. This attempt to impugn the prosecutor's integrity is not supported by the record and the rhetoric used does not support the persuasive value of Mr. Johnson-Clark's brief.

a prior crime of dishonesty. And, according to what the parties apparently knew at the time of trial, Mr. Johnson-Clark was the only witness who *could* have been impeached with a prior crime of dishonesty.

Mr. Johnson-Clark appears to believe that the inadmissibility of the other witnesses' convictions did not render them materially different from Mr. Johnson-Clark's conviction. To the extent this is Mr. Johnson-Clark's position, it is mistaken. At their essence, the rules of evidence are aimed at marshalling the admissibility of relevant and irrelevant information. Evidence of a witnesses' prior bad acts, including prior crimes, is often deemed irrelevant and not admissible. *See* ER 404(a). But there are some limited exceptions. The rules recognize evidence of a prior crime can be relevant to assess a witness's credibility. *See* ER 609. But the older a conviction, the less probative weight it carries. *See* ER 609(b). People change, often for the better. After 10 years, criminal convictions are generally classified as irrelevant to credibility and therefore inadmissible. *Id*. Here, based on the evidence known at trial, Mr. Johnson-Clark was the only witness with a crime of dishonesty recent enough to be deemed relevant under the rules of evidence. This was a material distinction and the proper subject for the prosecutor during summation.

Mr. Johnson-Clark's posttrial disagreement with the words chosen by the prosecutor to emphasize the difference between Mr. Johnson-Clark and the other witnesses does not support a claim of flagrant and ill-intentioned misconduct. His claim of prosecutorial misconduct fails.

(2) *Vouching*

Vouching occurs when a prosecutor provides personal assurances about the credibility of a witness or the merits of a case. *State v. Ish*, 170 Wn.2d 189, 196, 241 P.3d 389 (2010) (plurality opinion). It can also happen when the prosecutor suggests information outside the record supports its theory of the case. *Id*. The prohibition on vouching does not prevent the prosecutor from arguing their case. The prosecutor can argue witness credibility, including explaining why a witness should or should not be believed. Especially when there is no objection at trial, relief based on improper vouching is unwarranted unless it is "'clear and unmistakable'" that a prosecutor is inserting their personal opinion into the case. *State v. Brett*, 126 Wn.2d 136, 175, 892 P.2d 29 (1995) (quoting *State v. Sargent*, 40 Wn. App. 340, 344, 698 P.2d 598 (1985)).

Mr. Johnson-Clark contends two types of vouching happened here. First, he claims the prosecutor vouched for the credibility of Brittney Fristed by arguing, "what does Brittney Fristed do? She actually calls the police. Isn't that what an honest person who's

22

telling the truth is gonna do? Call the police." 3 RP (Jan. 27, 2022) at 1468. Second,

similar to the argument addressed above, he argues the prosecutor improperly suggested

that there were facts outside the record showing that none of the State's witnesses had

convictions for crimes of dishonesty.

We reject both vouching claims. First, the prosecutor's statement regarding

Brittney Fristed consisted of an argument for why the jury should find her credible. It

was not a personal assurance of Brittney Fristed's credibility. Second, as set forth above,

we interpret the prosecutor's statement regarding criminal history to be an observation

about the evidence elicited at trial. There was no evidence admitted that any witness other

than Mr. Johnson-Clark had been convicted of a crime of dishonesty. By pointing out this

fact, the prosecutor was not improperly suggesting to the jury that there were facts outside

the record supporting its theory of the case.

(3) *Mischaracterized court's jury instructions*

Mr. Johnson-Clark concedes his prior conviction was admissible under ER 609.

However, he argues the prosecutor's use of the term "crime of dishonesty" in referring

to the conviction was overly prejudicial and exceeded the scope of admissible evidence

under ER 609(a). Further, he argues the prosecutor improperly mischaracterized the trial

court's jury instruction by making it appear as if the court endorsed the phrasing.

Mr. Johnson-Clark cites no authority for his criticisms of the prosecutor's

argument. The reason Mr. Johnson-Clark's conviction was admissible was because it

qualified as a "crime of dishonesty" under ER 609. The trial court specifically ruled

the conviction was admissible as a "crime of dishonesty." 3 RP (Jan. 26, 2022) at 1337.

We find no misconduct.[9]

*First aggressor jury instruction*

Mr. Johnson-Clark's final argument is that the trial court erroneously issued a first

aggressor jury instruction. Again, we disagree.

Washington law specifies that the right of self-defense does not apply to someone

who acts as a first aggressor to a confrontation. The jury may be provided a first aggressor

instruction in circumstances where "(1) the jury can reasonably determine from the

evidence that the defendant provoked the fight, (2) the evidence conflicts as to whether

the defendant's conduct provoked the flight, or (3) the evidence shows that the defendant

made the first move by drawing a weapon." *State v. Anderson*, 144 Wn. App. 85, 89,

---

[9] Because the prosecutor did not engage in misconduct, we reject Mr. Johnson-Clark's argument that his trial counsel was ineffective for failing to object to the prosecutor's conduct. *See Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984) (A claim of ineffective assistance of counsel requires proof of prejudice.).

180 P.3d 885 (2008). Words alone are not sufficient to justify a first aggressor instruction. *State v. Riley*, 137 Wn.2d 904, 910-11, 976 P.2d 624 (1999).

The propriety of a first aggressor jury instruction in a particular case is "highly fact-specific." *State v. Grott*, 195 Wn. 2d 256, 267, 458 P.3d 750 (2020). In reviewing whether a trial court erred in issuing a first aggressor instruction, an appellate court "must carefully consider the specific evidence presented at trial in the light most favorable to the requesting party." *Id.*

The State's primary theory at trial was that Mr. Johnson-Clark shot Mr. Rice unprovoked. Under this theory, the first aggressor instruction was unnecessary. It only became necessary if the jury believed Mr. Johnson-Clark's story that Mr. Rice was behaving aggressively and pulled out what appeared to be a gun.

Reviewing the facts in the prosecution's favor, there was a tenable basis for issuing the first aggressor instruction. The uncontested evidence was that, prior to May 3, Mr. Johnson-Clark had threatened to kill Mr. Rice. On May 3, Mr. Johnson-Clark decided to leave Brittney Fristed's apartment and go outside to confront Mr. Rice. Before doing so, he armed himself with a loaded handgun and waited until Mr. Rice was alone. Given the totality of the circumstances, a jury could find that Mr. Johnson-Clark's conduct, beyond merely his words, was sufficiently threatening to place Mr. Rice in reasonable

fear of a deadly assault. To the extent the jury found Mr. Rice was the first to pull out a weapon, it could have concluded Mr. Johnson-Clark was not entitled to assert self-defense because he was the initial aggressor.

The trial court properly issued the initial aggressor instruction.

## CONCLUSION

The judgment of conviction is affirmed.

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

_____
Pennell, J.

I CONCUR:

_____
Staab, A.C.J.

26

No. 38848-4-III

FEARING, J. (concurring) — I conclude, contrary to the majority, that the State's attorney misspoke during closing argument. Nevertheless, I concur in the affirmation of Kyle Johnson-Clark's conviction because counsel did not engage in flagrant or ill-intentioned misconduct and because the overwhelming evidence, including Kyle Johnson-Clark's own testimony during a withering cross-examination, supports the jury's finding that Johnson-Clark did not shoot Daniel Rice in self-defense.

The prosecuting attorney, during closing, commented:

> When she [Brittney Fristed] learns—well, let's compare. We have a different story, a story by the way from somebody who has a motive to lie, and not only does [Kyle Johnson-Clark] have a motive to lie, but you heard the Court's instruction: We do know that the defendant has been convicted of a crime of dishonesty, and you can consider the fact that the defendant has been convicted of a crime of dishonesty, you can consider that in assessing the defendant's credibility.
>    In other words, the defendant has *less credibility than all the other witnesses* because of his prior conviction, and that's what the Court just instructed you. That you can consider that. Not that you have to, but it's something for you to consider. Ask yourself, was there any other witness— all these other witnesses, by the way, who contradict the defendant's testimony, *did any of these other witnesses who testified have a crime of dishonesty? Nope.*
>    Let's start with Brittney Fristed. Nope, she didn't. And let's look at their actions. The next day when she realizes that there's been a murder, and it was Daniel Rice, and Daniel Rice is dead, and then the later events, what does Brittney Fristed do? She actually calls the police. Isn't that what an honest person who's telling the truth is gonna do? Call the police.
>    And what does she tell the police? She tells them exactly where she drove the defendant to and the police follow up on the information. They get Dive and Rescue, and what do the police find? They find the gun that the defendant stole from his cousin in virtually the exact place where Brittney Fristed said that she dropped the defendant off.

Now, let's compare that to the defendant's story. *A story that we can examine for credibility due to the fact that he has a conviction for a crime of dishonesty* and a motive to lie, and a continuing story that is contradicted again and again and again by every other witness who testified in this trial.

3 Report of Proceedings (RP) (Jan. 27, 2022) at 1467-68 (emphasis added).

ER 609 declares:

**IMPEACHMENT BY EVIDENCE OF CONVICTION OF CRIME**

**(a) General Rule.** For the purpose of attacking the credibility of a witness in a criminal or civil case, evidence that the witness has been convicted of a crime shall be admitted . . . only if the crime (1) was punishable by . . . imprisonment in excess of 1 year under the law under which the witness was convicted, and the court determines that the probative value of admitting this evidence outweighs the prejudice to the party against whom the evidence is offered, or (2) involved dishonesty or false statement, regardless of the punishment.

**(b) Time Limit.** Evidence of a conviction under this rule is not admissible if a period of more than 10 years has elapsed since the date of the conviction or of the release of the witness from the confinement imposed for that conviction, whichever is the later date, unless the court determines, in the interests of justice, that the probative value of the conviction supported by specific facts and circumstances substantially outweighs its prejudicial effect. However, evidence of a conviction more than 10 years old as calculated herein, is not admissible unless the proponent gives to the adverse party sufficient advance written notice of intent to use such evidence to provide the adverse party with a fair opportunity to contest the use of such evidence.

Kyle Johnson-Clark appends to his opening brief Judicial Information System (JIS) records that list Brittney Fristed's, Sarah Morse's, Ricco Garza's, and Jeramie Vannauker's involvement in the criminal justice system as victims, witnesses, accused, and offenders. To our knowledge, neither party reviewed these records before this appeal. The State does not challenge the accuracy of the appendix.

2

State witnesses Brittney Fristed, Sarah Morse, Ricco Garza, and Jeramie Vannauker all maintain convictions for crimes of dishonesty. Brittney, Morse, and Garza all garnered theft convictions. The State convicted Vannauker seven times for theft and one time each for witness tampering, forgery, possession of a stolen firearm, taking a vehicle without permission, and false reporting. Theft is a crime of dishonesty under ER 609(a)(2). *State v. Brown*, 113 Wn.2d 520, 552-53, 782 P.2d 1013, 787 P.2d 906 (1989). So too is witness tampering. *State v. Bankston*, 99 Wn. App. 266, 270, 992 P.2d 1041 (2000). Forgery qualifies as a crime of dishonesty under the evidence rule. *State v. Teal*, 117 Wn. App. 831, 843, 73 P.3d 402 (2003). So also does possession of stolen property. *State v. McKinsey*, 116 Wn.2d 911, 913, 810 P.2d 907 (1991). Taking a vehicle without permission falls within the purview of ER 609(a)(2). *State v. Trepanier*, 71 Wn. App. 372, 380-81, 858 P.2d 511 (1993). Finally, any conviction for uttering a false statement, almost by definition, entails a crime of dishonesty. *State v. Pfeifer*, 42 Wn. App. 459, 463, 711 P.2d 1100 (1985).

All but one of the convictions of the four witnesses escaped use for impeachment because of an age exceeding ten years. Defense counsel could have employed one conviction of Jeramie Vannauker because authorities released him from prison for the conviction within the last ten years.

The majority writes that the State's attorney did not misspeak because all but one of the crimes for dishonesty lay within ten years. But the prosecutor unequivocally stated that none of "these other witnesses who testified have a crime of dishonesty."

3

3 RP (Jan. 27, 2022) at 1467. The State's attorney did not qualify his declaration with "within the last ten years," "recently," "or that could be used for impeachment." Tempering the statement with the additional language would lessen the impact of the argument, but such a qualification was needed to render the assertion true.

The majority implies that the prosecuting attorney's declaration was literally true because the jury never heard any testimony during trial that any of the witnesses suffered convictions of dishonesty. The law must not be so narrow as to deem the boundaries of truth being drawn only from courtroom testimony. Kyle Johnson-Clark's jury did not know that any evidence rule precluded impeachment by aged convictions. The jury instead would have concluded that none of the State's witnesses had, during each's respective lifetimes, been convicted of a crime of dishonesty despite this assertion being untrue.

Neither counsel, particularly the prosecutor, may mislead the jury. *State v. Reeder*, 46 Wn.2d 888, 892, 285 P.2d 884 (1955). The prosecutor commits error by misstating the evidence. *State v. Monday*, 171 Wn.2d 667, 676-77, 257 P.3d 551 (2011); *State v. Meza*, 26 Wn. App. 2d 604, 620-21, 529 P.3d 398 (2023).

The majority writes that the record does not reflect that the prosecuting attorney knew of the convictions of the witnesses, an observation with which I agree. Still, the State should have known of the convictions. The prosecuting attorney's office and law enforcement had access to the records showing the prior convictions of their witnesses.

4

The State has a constitutional obligation to disclose evidence favorable to the defendant whether or not the defendant requests it. *Brady v. Maryland*, 373 U.S. 83, 87-89, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963). This includes evidence that may be used to impeach a witness's credibility. *United States v. Bagley*, 473 U.S. 667, 682-83, 105 S. Ct. 3375, 87 L. Ed. 2d 481 (1985). One way to impeach a witness is by introducing evidence of a prior criminal conviction of that witness. *Davis v. Alaska*, 415 U.S. 308, 316, 94 S. Ct. 1105, 39 L. Ed. 2d 347 (1974). The duty of the State to disclose information to the defense extends to information known to the police. *United States ex rel. Smith v. Fairman*, 769 F.2d 386, 391-92 (7th Cir. 1985); *State v. Davila*, 184 Wn.2d 55, 71, 357 P.3d 636 (2015).

The government has greater resources including access to databases. *State v. Durant*, 430 S.C. 98, 109-10, 844 S.E.2d 49 (2020). The government must disclose to the defense the criminal background of its witnesses. *United States v. Hemphill*, 514 F.3d 1350, 1360 (D.C. Cir. 2008); *State v. Durant*, 430 S.C. 98, 109-10, 844 S.E.2d 49 (2020); *In re Watkins*, 369 S.W.3d 702, 706 (Tex. App. 2012). One court even held that the government must disclose to the criminal defense uncharged alleged crimes of a witness. *DeCiantis v. State*, 24 A.3d 557, 572-73 (R.I. 2011).

Once a defendant establishes that a prosecutor's statements are improper, the court determines whether the defendant suffered prejudice under one of two standards of review. *State v. Emery*, 174 Wn.2d 741, 760, 278 P.3d 653 (2012). If the defendant objected at trial, he must show that the prosecutor's misconduct "resulted in prejudice

5

that had a substantial likelihood of affecting the jury's verdict." *State v. Emery*, 174 Wn.2d 741, 760 (2012). Alternatively, if the defendant did not object at trial he "waives any error, unless the prosecutor's misconduct was so flagrant and ill intentioned that an instruction could not have cured the resulting prejudice." *State v. Emery*, 174 Wn.2d 741, 760-61 (2012). "If the latter standard applies, the defendant must show that no curative instruction would have prevented any prejudicial effect and that the prejudice had a substantial likelihood of affecting the jury verdict." *State v. Restvedt*, 26 Wn. App. 2d 102, 126, 527 P.3d 171 (2023). Kyle Johnson-Clark did not object to the closing argument of the prosecuting attorney.

The closing argument of the State's counsel was not flagrant or ill intentioned. I agree with the majority that Kyle Johnson-Clark overstates his argument when accusing the prosecutor of lying.

Regardless of the misstatement of the State's attorney, the jury would have convicted Kyle Johnson-Clark. All witnesses, even those who one might expect to support him, contradicted Johnson-Clark's testimony in key areas. The physical evidence contradicted Johnson-Clark's assertion of self-defense. Johnson-Clark's own words plastered in a plethora of electronic messages destroyed his defense. Common sense contradicted Johnson-Clark's narrative.

Kyle Johnson-Clark in instant messages leading to May 3, 2019, wrote to Bethany Fristed: "I'm gonna kill him." Ex. 132E at 26.

> End it. . . . An he will be left alone. . . . He's green lit. . . .
> He is green lit he goes to any prison in america he is getting stabbed up.

Ex. 132E at 28-29. The last message before Daniel Rice's death read: "He's dead."

Ex. 132E at 30.

Kyle Johnson-Clark sent Facebook messages to Daniel Rice: "Damn homie so u tried to snake me for my bitch??? Ur green lit by ab so the joint is all bad for u an when would watch over ur shoulder player." Ex. 132D at 1. Daniel Rice sent no responding messages.

Kyle Johnson-Clark stole from his cousin the gun he used to shoot Daniel Rice. He contradicted his own cousin about his permission to use the gun. When the cousin opened the gun case the day after the shooting, he noticed a BB gun in its place. If Johnson-Clark borrowed the gun with permission, the replacement gun was superfluous.

The forensic pathologist testified to all three bullet wounds suffered by Daniel Rice entering his body through the back. The pathologist testified that Rice could not have run more than a few steps after the bullet went through his head. The deceased body's location near the laundry room shows an attempt by Rice to hide from Kyle Johnson-Clark. Johnson-Clark contends that Rice aimed a gun at him and immediately turned his back, an event highly improbable. Bethany Fristed observed Johnson-Clark walk toward Rice as she heard gunshots.

No gun was found on or near the body of Daniel Rice. No witnesses, including disinterested witnesses who exited apartments after hearing gunshots, testified to seeing

7

Rice with a firearm. The only bullets found in the vicinity of the crime came from the gun handled by Kyle Johnson-Clark. All bullet casings matched the gun.

Kyle Johnson-Clark's conduct after the shooting confirmed a consciousness of guilt. He immediately ran from the scene rather than await arrival of law enforcement in order to tell his side of the story. Brittney Fristed gave Johnson-Clark a ride from a nearby school and he declined to tell Brittney of the earlier shooting. Johnson-Clark directed Brittney to drive to the Columbia River without informing Brittney of his purpose. He disappeared into brush and hurled the gun into the water outside the viewing of Brittney.

Kyle Johnson-Clark and Bethany Fristed purchased bleach to clean Johnson-Clark's hands of gunshot residue. The two enlisted Brittney Fristed and Ricco Garcia to purchase the bleach without informing them of the reason. Bethany and Johnson-Clark disposed of the bleach container, Johnson-Clark's phone, and his clothes in rural Franklin County. Law enforcement found the possessions in the locations identified by Bethany.

On the evening of May 3, Kyle Johnson-Clark fled to Spokane. That night he called Brittney Fristed and asked her to lie to law enforcement by stating he was in Spokane all evening. He eventually scurried to St. Louis to hide from law enforcement. Before trial, Johnson-Clark wrote to Brittney Fristed advising her that no one can force her to testify.

Kyle Johnson-Clark's sometimes girlfriend, Bethany Fristed, protected Johnson-Clark at first. She helped to purchase bleach for his hands. She rode with him to dispose

8

of his phone, clothes, and the bleach bottle. After telling a false statement to law enforcement, she returned to tell the truth.

Kyle Johnson-Clark and his trial counsel legitimately concluded that Johnson-Clark likely needed to testify in order to possess a chance of acquittal. Nevertheless, the brandishing cross-examination by the State's counsel of Johnson-Clark proved his guilt beyond a reasonable doubt. A reading of the crushing examination leads a reviewing judge to yearn for a return to the vocation of trial attorney.

Throughout his direct examination, Kyle Johnson-Clark protested that he never meant any harm to Daniel Rice and sent Rice messages in an attempt to quell any hostility resulting from each man pursuing the same woman. The State's attorney emphasized, during cross-examination, the implausibility of Johnson-Clark being a peacemaker when he left Brittney Fristed's apartment to confront Rice, who lacked any reason to know of the presence of Johnson-Clark in the apartment complex. Rice went to the apartment complex not to see Johnson-Clark but to help friends. Johnson-Clark sometimes insisted that he needed to act threatening in order to appear equal to Rice. At other times, Johnson-Clark averred that he acted docilely in order to reduce any tension between him and Rice. When the State's counsel posed whether the numerous threatening messages sent to Rice sought to diffuse the animosity, Johnson-Clark insisted they did. Johnson-Clark implausibly avowed that his messages to Bethany Fristed of Rice being green lit and dead meant nothing. He incredibly disclaimed any jealousy of Rice having a sexual relationship with Bethany.

9

During cross-examination, Kyle Johnson-Clark denied that his use of "ab" in a message to Daniel Rice referenced the "Aryan Brotherhood." Nevertheless, he provided no alternative explanation for his use of the acronym. He denied knowing the extreme meaning of "green lit," despite employing it in messages. Johnson-Clark first insisted he borrowed his cousin's gun. After additional questioning, he reluctantly conceded to stealing the gun.

Kyle Johnson-Clark testified he did not know whether any of the shots he fired struck Daniel Rice as he left the apartment complex parking lot. Johnson-Clark improbably avowed that, when Brittney Fristed retrieved him from a school lot, she took his gun from him and he never went to the Columbia River. Johnson-Clark implausibly asserted that Bethany Fristed decided to go to the Walmart to purchase bleach at 10:00 p.m. in order to do laundry despite overwhelming evidence that he consistently controlled the relationship. He also fantastically asserted that he wanted to speak with police but Bethany and Brittney convinced him otherwise. He could not explain why law enforcement found the Clorox bottle, that Bethany allegedly wished to use for laundry on the night of May 3, in rural Franklin County. During the questioning by the prosecutor, Johnson-Clark persistently avoided answering pertinent questions thereby destroying any remaining credibility.

Kyle Johnson-Clark also argues that his trial counsel performed ineffectively because of a failure to impeach Jeramie Vannauker with the earlier conviction that ER 609 permitted to be introduced. The majority writes that the record does not show

10

that counsel knew or should have known of the conviction. I disagree. Trial counsel could have accessed records to learn of the conviction. Trial counsel could have demanded that the State disclose convictions of its witnesses. Nevertheless, I reject Johnson-Clark's assignment of ineffective assistance of counsel because of the lack of prejudice. In addition to showing a performance that fell below an objective standard of reasonableness, the defendant must show any deficient representation prejudiced him. *Strickland v. Washington*, 466 U.S. 668, 687-88, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). In other words, the accused must establish a reasonable probability that, except for counsel's unprofessional errors, the result of the proceeding would have been different. *State v. McFarland*, 127 Wn.2d 322, 334-35, 899 P.2d 1251 (1995). I have already outlined the overwhelming evidence of guilt.

    I concur:

_Fearing, J._
Fearing, J.

11